666 So.2d 1128 (1995)
WOOLF & MAGEE, a Division of DI Industries, Inc., et al., Plaintiffs-Appellees,
v.
James E. HUGHES, Defendant-Appellant.
No. 95-863.
Court of Appeal of Louisiana, Third Circuit.
December 6, 1995.
Writ Denied March 15, 1996.
*1129 Milo Addison Nickel Jr., Michael Glenn Hodgkins, Lake Charles, for Woolf & Magee, a Div. of DI Industries.
Mark Cameron Andrus, T. Robert Shelton, Mylan W. Dawson, Lafayette, for James E. Hughes.
Before KNOLL, THIBODEAUX and AMY, JJ.
THIBODEAUX, Judge.
Plaintiffs, Woolf & MaGee, a Division of DI Industries, Inc., and Tadlock Pipe and Equipment, Inc., seek payment for services performed and equipment supplied in connection with HAM Consulting Company/William Lagnion joint venture's effort to complete the drilling on the W.R. Levering # 1 Well located in Calcasieu Parish from the defendant, James E. Hughes, pursuant to an allegedly unambiguous contract of guaranty entered into by Hughes, Woolf & MaGee and Tadlock. This guaranty agreement served as an inducement to Woolf & MaGee to extend credit to HAM/Lagnion. Initially, Woolf & MaGee was unwilling to extend credit to HAM/Lagnion because the cost and expenses associated with the services HAM/Lagnion sought were substantial and, having no prior business relationship with HAM/Lagnion, Woolf & MaGee requested some type of security.
Hughes, Ham/Lagnion's guarantor, appeals from the judgment of the trial court which found the guaranty contract to be unambiguous. The trial court determined that the intent of the parties contemplated Hughes being personally responsible for payment to Woolf & MaGee and Tadlock to complete the drilling to the pre-designated depth.
We affirm.

FACTS
HAM/Lagnion, a joint venture, contacted Woolf & MaGee in July, 1991, and requested that Woolf & MaGee perform services and furnish materials to HAM/Lagnion in connection with its efforts to complete Levering Well. Prior to agreeing to provide the services, Woolf & MaGee required prepayment for the work to be performed. HAM/Lagnion next approached Hughes and requested that he provide a "Specific Guaranty" for amounts which were expected to be due to Woolf & MaGee in the event HAM/Lagnion did not pay the debts on a timely basis.
As assurance that Hughes was financially able to guarantee the debts of HAM/Lagnion, Hughes provided to Woolf & MaGee a statement of his financial condition. After reviewing Hughes' financial statement and a brief inquiry into his creditworthiness, Woolf & MaGee agreed to extend credit to HAM/Lagnion. Hughes claims that HAM/Lagnion told him that it was in the process of obtaining financing from another source and would only need Hughes to guarantee a portion of the costs, to-wit, the completion costs. HAM/Lagnion assigned a 2.5% working interest in the Levering Well to Hughes as an inducement for Hughes to sign the "Specific Guaranty." Hughes agreed to specifically guarantee the "day work charges of Woolf & MaGee to complete the W.R. Levering No. 1."
Woolf & MaGee, provided services and/or materials to the Levering Well and invoiced HAM/Lagnion for those services and/or materials. The first invoice was for the amount of $244,145.31 and the second invoice totaled $875.82. These invoices were sent to HAM/Lagnion for payment in August, of 1991. Woolf & MaGee did not receive payment as of December, 1991 and was subsequently *1130 informed that HAM/Lagnion had filed for bankruptcy. Thereafter, Woolf & MaGee, pursuant to Hughes' guaranty, sent a certified letter to Hughes demanding payment of the HAM/Lagnion debt. Hughes admitted that he received Woolf & MaGee's demand for payment. When Woolf & MaGee failed to receive payment, the instant suit was filed.
Hughes issued a similar guaranty to Tadlock. The Tadlock invoices totaled $81,280.89. Hughes also acknowledged receipt of Tadlock's demand for payment. Hughes never disputed the amount owed to Tadlock. When Hughes failed to pay the debt, Tadlock filed suit against Hughes. Thereafter, Hughes made partial payment to Tadlock in the amount of $20,000.00 which was credited toward the outstanding invoice amount. Later, Hughes sent lumber to Tadlock as a partial set-off for the total amount due. The outstanding balance owed to Tadlock is now $40,501.72. The "Specific Guaranty" agreements executed by Hughes in favor of Woolf & MaGee and Tadlock are attached to this opinion as Appendix "A" and Appendix "B."
The language of the "Specific Guaranty" agreements describing the debts Hughes guaranteed to Woolf & MaGee and Tadlock respectively, is as follows:
The daywork charges of Woolf & Magee to complete the W.R. Levering No. 1 (section 9, T10S-R7W; Manchester Field; Calcasieu Parish, LA)
* * * * * *
Services to complete the W.R. Levering No. 1 (Section 9, T10S-R7W; Manchester Field, Calcasieu Parish, Louisiana, not to exceed $100,000 (One Hundred Thousand Dollars).
In addition to the debt obligations detailed in the Specific Guaranty agreements, Hughes filed a mineral mortgage identifying the two Specific Guaranty agreements and limiting his total liability to $350,000.00.
The trial court found that it was the intention of the parties to allow completion of the well. The trial court defined the phrase "to complete" of the Specific Guaranty as "to finish" something that was started at an earlier date. The trial court stated: "Based upon the testimony I've heard, this thing [drilling of the Levering Well] would not have gone forward from the 11th or 12th of July one day further if there would not have been a guaranty to take care of the expenses henceforth by ... Mr. Hughes." It is from this interpretation of the Specific Guaranty that Hughes appeals asserting one assignment of error: the district court erred in concluding that Hughes was obligated under the Woolf & MaGee "Specific Guaranty" to pay all amounts owed by HAM/Lagnion JV to Woolf & MaGee for services rendered at the W.R. Levering No. 1.
The issue is whether, pursuant to the language of the Specific Guaranty executed by Hughes in favor of Woolf & MaGee, Hughes is obligated to pay for all of the charges submitted by Woolf & MaGee for services it rendered at the Levering Well. For the following reasons, we agree with the trial court and find that Hughes owes Woolf & MaGee the total amount as invoiced by Woolf & MaGee.

LAW AND DISCUSSION
Hughes' argument that the intent in the Specific Guaranty was that Hughes only guarantee payment for a portion of the "daywork charges" performed by Woolf & MaGee "to complete" the well is specious but ultimately untenable. We agree with Woolf & MaGee. The trial court's initial inquiry involves determining whether the words of the contract clearly and explicitly set forth the intent of the parties. This methodology limits the interpretation of a contract to the internal language of the contract itself. Weeks v. T.L. James & Co. Inc., 626 So.2d 420 (La.App. 3 Cir.1993), writs denied, 93-2909 (La. 1/28/94), 630 So.2d 794 and 93-2936 (La. 1/28/94), 630 So.2d 794.
Louisiana Civil Code Article 2046 provides:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
This court has long recognized that where the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document. *1131 Weeks, 626 So.2d at 423. The contract is the law between the parties, and no further interpretation may be made in search of the parties' intent when the words of the contract are clear, explicit and lead to no absurd consequences. Id. The courts are obligated to give legal effect to such contracts according to the parties' true intent. Borden v. Gulf States Utilities Co., 543 So.2d 924 (La.App. 1 Cir.), writ denied, 545 So.2d 1041 (La.1989). Whether a contract is ambiguous or not is a question of law. Id.
When appellate review is not premised on any factual findings made by the trial court but is based upon an independent review and examination of the contract on its face, the manifest error rule is inapplicable. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Weeks, 626 So.2d at 423. Further, the rule of strict construction does not authorize a perversion of language or the exercise of inventive powers for the purpose of creating ambiguity where none exists. It does not authorize a court to make a new contract for the parties or disregard the evidence as expressed, nor does it refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties. Id.
When doubt exists as to the true sense of the words or phrases, each contract provision must be explained by reference to other provisions, words or phrases used in the same contract. La.Civ.Code art. 2050. The words of a contract must be given their general meaning, and words of art and technical terms must be given their technical meaning when the contract involves a technical matter. La.Civ.Code art. 2047. Comment (b) to La.Civ.Code art. 2047 addresses the applicability of Article 2047:
The rules of error must apply whenever it is evident that one party understood a particular technical word or term as having a meaning different from that given it by the other party, and that misunderstanding can be deemed excusable.
Thus, only when a party to a contract understood a technical word or term to mean something different than what the other party understood it to mean does the rule of error become applicable and then only when the misunderstanding is excusable.
Hughes argues that the explicit language of the contract supports his position that he was only securing the services rendered by Woolf & MaGee for the "completion" portion of the work done at the Levering Well. Hughes asserts that the phrase "to complete" in the Specific Guaranty refers to the "completion" phase of the well operations. Woolf & MaGee, on the other hand contends that the "Specific Guaranty" was intended to cover all sums due Woolf & MaGee from HAM/Lagnion regardless of in which stage of the operations the expenses were incurred. We agree with Woolf & MaGee's position. To do otherwise would assign the technical term "completion," which is a specific phase of a drilling operation, to the phrase "to complete."
Hughes attempts to transform an ordinary verb phrase "to complete" into words of art and/or technical terms. However, had the parties, experienced in the oil field business, intended to gain security for the "completion" phase of the Levering Well operations, they could have easily used the term "completion." The contract does not contain the technical term "completion." Furthermore, Hughes' argument that technical terms must be given their technical meaning in a contract that involves a technical matter neglects to take into account the prerequisite that his misunderstanding of the term be excusable. La.Civ.Code art. 2047, Comment (b).
The testimony of Hughes with respect to operations conducted on the Levering Well by Grace Drilling Company prior to Woolf & MaGee's involvement indicates that Grace started the drilling but was unable to continue because HAM/Lagnion ran out of money. However, HAM/Lagnion wanted to continue drilling to the predesignated depth of 13,500 feet and contacted Woolf & MaGee and Tadlock. The record reveals that had Hughes not executed the "Specific Guaranty" in favor of Woolf & MaGee and Tadlock, operations on the Levering Well would have ceased on July 11th or 12th of 1991. At the outset, the Levering Well was to be drilled to a depth of 13,500 feet. However, Grace stopped drilling *1132 at 8,000 feet. The operations on the Levering Well as of July 12, 1991, had not reached the completion phase as that phase was defined by Hughes' expert.
A court cannot annul or amend a contract simply to avoid some supposed hardship arising therefrom. Its duty is confined to the ascertainment of the limits of the rights and obligations of the contracting parties as they have defined them for themselves. Furthermore, a contract cannot be undermined simply because it was a bad deal for one of the parties. Weeks, 626 So.2d at 424.
The express language of the "Specific Guaranty" that Hughes executed in favor of Woolf & MaGee did not use the oil drilling technical term "completion." Moreover, because the "Specific Guaranty" used the verb phrase "to complete" coupled with the circumstances surrounding Hughes' agreement to guarantee the debt of HAM/Lagnionthe drilling process had only begun and was not yet finished and was to be completed by Woolf & MaGee and Tadlockas well as HAM/Lagnion and Hughes' Commercial Security Agreement which assigned Hughes a two and one-half percent (2.5%) working interest in the Levering Well, we conclude that the trial court's decision is supported by the clear provisions of the "Specific Guaranty." The agreement does not contemplate that Hughes' obligation was limited only to the completion phase of the Levering Well operations.
Woolf & MaGee and Tadlock assert in their brief that the trial court erred in failing to award it contractual interest and attorney's fees. In this respect, Woolf & MaGee and Tadlock seek a modification of the trial court's judgment. Woolf & MaGee and Tadlock, as appellees, did not file an answer to Hughes' brief nor did they file their own appeal from the decision of the trial court. An appellee who does not desire to have the trial court judgment modified, revised, or reversed in part or who does not demand damages against the appellant does not have to file an answer to the appeal. La.Code Civ.P. art. 2133. However, an answer or appeal must be filed where an appellee desires a modification, revision or reversal of the trial court's judgment. An answer filed by an appellee is equivalent to an appeal. Id.
Woolf & MaGee and Tadlock had fifteen days from June 28, 1995, to file an answer. Thus, the last day for filing an answer to the appeal was July 13, 1995. The answer was not filed until August 25, 1995. After dismissal by this court as untimely it was returned to Woolf & MaGee and Tadlock. Woolf & MaGee and Tadlock did not file an appeal. Therefore, pursuant to La.Code Civ.P. art. 2133, we will not consider the portions of Woolf & MaGee and Tadlock's brief which seeks to modify, revise or reverse the judgment of the trial court and those portions are hereby dismissed. See, Sanders v. Williams, 434 So.2d 172 (La.App. 3 Cir.), writ denied, 440 So.2d 759 (La.1983).
For the foregoing reasons, the judgment of the trial court in favor of plaintiff-appellees, Woolf & MaGee and Tadlock, and against defendant-appellant, Hughes, is affirmed. Woolf & MaGee and Tadlock's requests for contractual interest and attorney's fees are dismissed. Costs of this appeal are taxed against appellant, James E. Hughes.
AFFIRMED.
*1133 
*1134