689 So.2d 572 (1997)
Paul K. ADAMS, Plaintiff-Appellee,
v.
FRANCHISE FINANCE CORP. OF AMERICA, et al., Defendants-Appellants.
No. 96-855.
Court of Appeal of Louisiana, Third Circuit.
February 5, 1997.
Writ Denied April 18, 1997.
*573 Raymond L. Brown, Jr., Alexandria, for Paul K. Adams.
David McLean Culpepper, New Orleans, for Franchise Finance Corp. of America, et al.
Before WOODARD, SULLIVAN and GREMILLION, JJ.
GREMILLION, Judge.
The defendant, Franchise Finance Corp. of America (FFCA), appeals a judgment of the trial court denying its motion for summary judgment and granting the plaintiff's, Paul K. Adams, motion for summary judgment. We affirm.

FACTS
FFCA is the successor to three Delaware general partnerships, all of which merged into FFCA on June 1, 1994. Prior to that date, it was the general partner of Insured Income Properties 1984 (IIP84), and the managing general partner of both Insured Income Properties 1985 and 1986 (IIP85 and IIP86).
At issue in this case are purchase agreements and leases selling and then leasing back three Taco Bell franchises owned by Will-I, a Louisiana corporation, of which Adams was a shareholder. The first agreement, pertaining to a Natchitoches franchise, was executed on August 16, 1985, between Will-I, Inc. and IIP84. The second agreement, pertaining to an Alexandria franchise, was executed on August 11, 1986, between Will-I and IIP85. The final agreement, pertaining to a Pineville franchise, was executed on November 30, 1987, between Will-I and IIP86.
The terms of each purchase agreement and lease were similar. However, the 1985 and 1986 agreements required Will-I to purchase, as additional security, an unconditional and irrevocable letter of credit equal to six months rent. In the event that Will-I defaulted, IIP84 or IIP85 were entitled to draw upon the entire amounts of the letters of credit and apply the proceeds to "any and all amounts outstanding under the lease, to any damages or costs incurred by IIP84 or IIP85 in connection with the default of Will-I, or to any other costs incurred by IIP84 or IIP85, which they could determine at their sole discretion." The lease agreements further required Will-I to enter into a franchise or license agreement with Taco Bell, to remain in full force and effect for the full term of the lease.
An advance deposit of two months rent was required under the leases. This amount was to be applied as the last two months rent at the termination of the lease periods. Defaults and remedies were set out in the agreements:
(i) If any material representation or warranty of Lessee herein or as Seller in the Purchase Agreement was false when made, or in the event that any such representation or warranty is continuing and becomes false at any time, or if lessee renders any false statement or account;
(ii) If any rent of or other monetary sums due remain unpaid for 5 days after written notice thereof to Lessee;
(iii) If Lessee becomes insolvent, performs any act of bankruptcy or is not generally paying its debts as the same become due;
(iv) If there is a breach or default under the Purchase Agreement, under any license *574 or franchise permitting Lessee or Guarantors to operate the Premises in the manner authorized or if such license or franchise otherwise terminates or expires, under any Guarantee of Lessee's obligations under this Lease or under any other agreement between Lessor and Lessee.
. . . .
(c) In the event of any breach or default... Lessor shall be entitled to exercise, at its option ...:
(i) To terminate this Lease;
(ii) To reenter and take possession of the Premises ...;
. . . .
(iv) To relet the Premises or any part thereof for such term or terms (including a term which extends beyond the original term of this Lease), at such rentals and upon such other terms as Lessor, in is (sic) sole discretion, may determine with all proceeds received from such reletting being applied to the rentals and other sums due from Lessee in such order as Lessor may, it its sole discretion, determine, with Lessee remaining liable for any deficiency;
(v) To recover from Lessee an amount equal to the difference between the rentals and such other sums (including all sums required to be paid by Lessee, such as taxes and insurance) to be received from the date of such breach to the expiration of the original term hereof and the reasonable long term rental value of the Premises for the same period; and/or
(vi) To recover from Lessee all expenses, including attorney's fees, reasonably paid or incurred by Lessor as a result of such breach.
Prior to the closing of each purchase agreement, Will-I obtained the requisite franchising agreement from Taco Bell. On July 29, 1988, the Rapides Bank & Trust Company issued a letter of credit in favor of IIP85 in the maximum amount of $64,500.00. A second letter of credit was issued on November 18, 1988, in favor of IIP84, in the maximum amount of $40,000.00.
In 1988, relations between Taco Bell and Will-I deteriorated as a result of actions by Will-I. On September 7, 1988, Taco Bell threatened to terminate all three franchise agreements. However, Taco Bell extended the termination date to October 28, 1988, after receiving evidence that Will-I was negotiating the sale of the restaurants. Further extensions were granted on November 28, 1988 and December 12, 1988. On March 14, 1989, Taco Bell sent Will-I a notice of default due to its failure to pay its franchise and other fees. Taco Bell terminated Will-I's franchise agreements on April 17, 1989.
Will-I was also in trouble with its lessors. On April 25, 1989, it received a notice of default from FFCA for failure to pay its April rent under all three lease agreements. It was given five days to remit the amounts due. FFCA further informed Will-I that Taco Bell's termination of its franchise agreements constituted a default under the lease agreements. Will-I was given thirty days to reinstate the franchise agreements.
Following negotiations, Will-I executed an act of sale on April 28, 1989, selling all of its interest in the three franchises to Gregory J. Hamer. The sale was conditioned upon approval by Taco Bell and FFCA's release of Will-I from the leases. FFCA never approved this sale, but on that same day, it executed leases for the franchises in favor of Hamer. The effective date of the Hamer leases was May 1, 1989.
On May 2, 1989, due to the alleged default of Will-I, FFCA drew upon the maximum amount of the two letters of credit ($104,500.00). Adams, as personal guarantor, satisfied Will-I's obligations with the bank under the letters of credit. FFCA also retained the advance deposits under all three leases, $51,054.80.
Taco Bell reinstated the franchise agreements for the three restaurants, effective May 5, 1989. On that same day, Will-I executed an assignment in favor of Adams, whereby it assigned its interests in all the claims it possessed against FFCA and the IIP partnerships to Adams:

*575 [F]or the return of deposits or monies wrongfully obtained by execution on Letters of Credit issued by Rapides Bank and Trust Company of Alexandria in connection with those terminated leases between Will-I and FFCA.
Adams filed suit in the Ninth Judicial District Court on March 26, 1991, against FFCA, IIP84, IIP85, and IIP86. He alleged that FFCA's execution of the Hamer leases effectively terminated the Will-I leases, relieving Will-I of its rent obligations. Adams further alleged that FFCA's wrongful execution on the letters of credit and its retention of the advance deposits, in excess of Will-I's April rent obligations, constituted a breach of the Will-I leases. Adams prayed for the recovery of $155,555.00, less the April rent obligations of $25,527.40, plus costs and reasonable attorney's fees.
On April 30, 1991, FFCA removed the case to federal district court on the basis of diversity. The case was remanded back to the Ninth Judicial District Court on March 26, 1993, on motion of Adams due to a lack of complete diversity between the plaintiff and the defendants.
A third party demand was filed by FFCA against Will-I, Willard A. Harp, its majority shareholder and president of Will-I, and Lisa Harp, a shareholder and secretary. FFCA was seeking indemnity from the third party defendants under the lease agreements against any claims, demands, damages, attorney's fees, or any other liability arising from Adams' suit.
Adams filed a motion for summary judgment on April 4, 1996. This was followed by FFCA's motion for summary judgment, filed on April 19, 1996. After a hearing on April 29, 1996, the trial court issued a judgment granting Adams' motion and denying FFCA's. The trial court also awarded Adams $129,253.61, together with legal interest and attorney's fees equal to one-third of the award. Neither oral nor written reasons were issued by the trial court. FFCA suspensively appeals this decision.

ISSUES
FFCA raises three issues on appeal:
1. The trial court erred in granting Adams' motion for summary judgment.
2. The trial court award of one-third of the amount awarded as reasonable attorney's fees was grossly excessive and an abuse of discretion.
3. The trial court erred in denying its motion for summary judgment.
Adams answered the appeal seeking additional attorney's fees for work done on appeal.

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo applying the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors, 591 So.2d 342 (La.1991), appeal after remand, 94-0909 (La.App. 1 Cir. 3/3/95); 653 So.2d 612, writ denied, 95-1504 (La.9/22/95); 660 So.2d 480. Summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966. A fact is material if it determines the outcome of the legal dispute. Perkins v. Gregory Mfg. Co., 95-01396 (La.App. 3 Cir. 3/20/96); 671 So.2d 1036, writ denied, 96-0971 (La.5/31/96); 673 So.2d 1039. "Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be determined only in light of the substantive law applicable to the case." Moseley v. Law Enforcement Dist. of Avoyelles Parish, 95-1361, p. 2 (La.App. 3 Cir. 3/6/96); 670 So.2d 745, 746.
Because the mover has the burden of establishing that no material factual issue exists, inferences to be drawn from the underlying facts contained in the materials before the court must be viewed in the light most favorable to the opposing party. The party who defended the motion must have his properly filed allegations taken as true and must receive the benefit of the doubt when his assertions conflict with those of the movant. Id., 670 So.2d 745; Schroeder, 591 So.2d 342. *576 If there is any reasonable doubt as to the resolution of all material issues then summary judgment should not be granted and the matter should proceed to a trial on the merits. Moseley, 670 So.2d 745.

CONTRACT OF LEASE
A lease is a synallagmatic contract, to which consent alone is sufficient. La.Civ. Code art. 2669. The essential elements of a lease are: the thing, the price, and consent. La.Civ.Code art. 2670. The interpretation of a contract is the determination of the common intent of the parties. La.Civ.Code art. 2045. When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made by the courts in search of the parties' intent. La.Civ.Code art. 2046. When the language of a contract is clear and unambiguous, a court must interpret the contract solely by reference to the four corners of the document. Woolf & Magee v. Hughes, 95-863 (La.App. 3 Cir. 12/6/95); 666 So.2d 1128, writ denied, 96-0073 (La.3/15/96); 669 So.2d 427. "The contract is the law between the parties, and no further interpretation may be made in search of the parties' intent when the words of the contract are clear, explicit and lead to no absurd consequences." Id. at p. 5; at 1131. Whether the terms of a contract are ambiguous is a question of law. Borden Inc. v. Gulf States Utilities Co., 543 So.2d 924 (La.App. 1 Cir.), writ denied, 545 So.2d 1041 (La.1989).
In the case sub judice, the language of the Will-I leases are clear on what constitutes a default. They provide, in pertinent part, that a default will occur:
If any rent of or other monetary sums due remain unpaid for 5 days after written notice thereof to Lessee;
Accordingly, the failure to pay rent would ripen into a default if Will-I failed to pay the amount during the curative period following the notice of default. Will-I received written notice of default from FFCA on April 25, 1989. It had until April 30, 1989 to pay the rent and prevent a default from occurring.
We agree with FFCA that had a default occurred, it would have been entitled to all of the remedies listed under Paragraph 24(c). However, FFCA jumped the gun and effectively terminated the Will-I leases when it executed the Hamer leases on April 28, 1989.
We find no merit with FFCA's argument that the Hamer leases had no effect because their effective dates were May 1, 1989. The Louisiana Civil Code provides that a contract is formed by the consent of the parties established through offer and acceptance. La.Civ. Code art. 1927. Article 2669 states that consent alone is sufficient to form a contract of lease. Thus, the Hamer leases were formed on April 28, 1989, the date Hamer signed the contracts, and the Will-I's leases were terminated. Although Hamer would not have had access to the premises until May 1, 1989, a contract of lease existed between him and FFCA on April 28, 1989. At oral argument, FFCA admitted that the Hamer leases were executed within the five day curative period afforded Will-I and that had Will-I been able to reinstate its franchise agreements and pay its April rent, then FFCA would have had a problem on its hands.
For the foregoing reasons, we find that the trial court was correct, as a matter of law, in granting Adams' motion for summary judgment and in denying FFCA's motion. The trial court's judgment is affirmed and this assignment of error is without merit.

ATTORNEY'S FEES
In its next assignment of error, FFCA argues that the trial court erred in awarding Adams attorney's fees of one-third of $129,253.61, or $43,084.53. FFCA argues that Adams possessed no contractual right under the Will-I leases which would entitled him to an award of attorney's fees. In the alternative, it argues that the amount awarded by the trial court was grossly excessive and an abuse of its discretion. Adams counters by arguing, that as the assignee of all of Will-I's rights under the lease agreements, he is entitled to attorney's fees which were provided for in the leases. In addition, he argues that FFCA has failed to prove that the amount awarded was an abuse of the trial court's discretion.
*577 Attorney's fees are not allowed except where authorized by statute or contract. State, DOTD v. Williamson, 597 So.2d 439 (La.1992). Whether attorney's fees should be awarded is left to the sound discretion of the trial court and an award should not be disturbed on appeal absent an abuse of discretion. Miller v. Ecung, 96-267 (La.App. 3 Cir. 6/5/96); 676 So.2d 656. Factors to be considered by the trial court in making an award of attorney's fees include the degree of professional skill and ability exercised, the amount of the claim, the amount recovered for the plaintiff, and the time devoted to the case. Domite v. Imperial Trading Co., Inc., 94-16 (La.App. 3 Cir. 8/3/94); 641 So.2d 715.
The recovery of attorney's fees was provided for in the Will-I leases:
In the event of any judicial or other adversarial proceeding between the parties concerning this Lease, to the extent permitted by law, the prevailing party shall be entitled to recover all of its reasonable attorney's fees and other costs in addition to any other relief to which it may be entitled.
As assignee of Will-I's rights under the leases, Adams was entitled to recover attorney's fees.
The trial court awarded Adams the entire amount that he was seeking, $129,253.61, including one-third of this amount as attorney's fees. No independent evidence was presented by Adams on this issue, other than what the trial court could observe from the record and an affidavit by Adams showing that he had signed a contingency fee contract with his counsel, providing for attorney's fees equal to one-third of the amount recovered.
In reviewing the record, we note the considerable actions taken by Adams' counsel as well as other members of his firm that have been involved with this litigation since its inception in 1991. Clearly, attorneys representing all parties have exercised a high degree of skill and ability as evidenced by the pleading, briefs, and oral arguments. There was a considerable amount of money in dispute and plaintiff made a full recovery in the trial court which was upheld by this court herein. Counsel for the plaintiff provided substantial legal services which consisted of numerous filings, considerable discovery, and the filing and opposing of the motion for summary judgment together with supporting memoranda and exhibits. During the course of this lengthy litigation, the case was removed to federal court only to be subsequently remanded back to state district court. Finally, the matter came before this court on appeal which required briefs and oral argument.
Generally, in a case for contractual attorney's fees, we would reject the arbitrary award of a contingent fee. However, in this instant, we find the trial judge did not abuse his discretion in making such an award. While there were no intricate legal issues involved in this litigation, the facts of this case were complicated and confusing. There were numerous parties and contracts involved and litigation in both state and federal court and at the trial level and on appeal. We find the award of the contingent fee, or the amount of $43,000.00, is not excessive nor an abuse of discretion. Accordingly, we affirm the trial court's judgment finding no merit in this assignment of error.

ANSWER TO APPEAL
Adams answered FFCA's appeal seeking additional attorney's fees on appeal. However, we have considered the work done on appeal as part of the work anticipated when the Adams entered into the contingent fee arrangement with his attorney. We, therefore, decline to increase those fees for the service rendered on appeal.

CONCLUSION
For the foregoing reasons, the judgment of the trial court granting Paul K. Adams' motion for summary judgment and denying Franchise Finance Corporation of America's motion for summary judgment is affirmed. Further, we affirm the trial court's award of a one-third contingent fee as attorney's fees in this matter. Finally, Adams' answer to the appeal seeking additional attorney's fees is denied. The costs of this matter are assessed *578 to the defendant-appellant, Franchise Finance Corporation.
AFFIRMED.